Savidge, Appellant, *v.* Dime T. & S. Co. et al.

334

Argued October 24, 1932.

Before Trexler, P, J., Keller, Gawthrop, Cunningham, Baldrige, Stadtfeld and Parker, JJ.

*Roger J. Dever,* for appellant.

*Ralph H. Behney,* and with him *A. L. Edwards,*
Deputy Attorney General and *Wm. A. Schnader,* Attorney General, for appellees.

OPINION BY CUNNINGHAM, J., January 25, 1933:

Arthur W. Savidge, the claimant in this workmen's compensation case, has appealed from an order of the court of common pleas of Northumberland County sustaining the exceptions of his employer, and its insurance carrier, to an award of compensation and entering judgment in their favor.

The award was made under the provisions of §306 (a) and provided for the payment of compensation, at the rate of $12 per week, for total and permanent disability from January 14, 1927, to continue "within the limitations" of that section; the order of the referee, dated February 6, 1931, was affirmed by the board June 16th.

The issues with which we are now concerned had their origin in the filing by claimant of a petition to review a compensation agreement executed in 1926. Two grounds for the judgment appealed from were stated in the opinion written for the court below by STROUSS, P. J.; (a) the petition for review was not filed within one year after the date of the last payment of compensation under the agreement, as required by the amendment of April 13, 1927, P. L. 186, 194, to §413 of the compensation law, and, (b) there was no legally competent evidence to support the finding of the compensation authorities that the then existing disability resulted from the accident upon which the agreement was based.

The assignments of error to the action of the court below necessitate a review by us of the history of this case and careful consideration of the evidence before the referee. That appellant was totally and permanently disabled when he filed his petition for review is

beyond question; by that time he had been obliged to undergo amputation of both legs and a vital issue (waiving for the moment the question whether his petition was barred by lapse of time) was whether there was any competent evidence of a causal connection between the accident and the loss of claimant's legs.

On March 17, 1926, claimant, then in the employ of Dime Trust and Safe Deposit Company of Shamokin, was helping to place globes in an outside electric sign when the only accident of which there is any proof in this case occurred. His description thereof reads: "I was helping put globes in and holding them and the iron support there, and in the meantime froze the tips of my fingers. ...... Q. When you put these bulbs in, you say you had your fingers frozen? A. Yes. Q. Anything happen to your feet? A. Not that I know of."

For three or four weeks he was treated by Dr. Holt and later by Dr. George Reese at the Shamokin State Hospital; on August 24, 1926, Dr. Reese removed the nails from four of claimant's fingers and operated upon the arteries to relieve "the burning and tingling in his hand" and later discharged him as cured and able to return to work. He testified that claimant "never complained about his feet at all," that he made no examination of them, and never treated him subsequently.

The parties entered into an open agreement for payment of compensation for disability beginning August 26, 1926, and payments were made thereunder until December 16, 1926. The description of the accident in the agreement was, "fingers were frozen while assisting in the placing of globes on electric sign." A final receipt, dated December 16, 1926, was signed by claimant and he returned to work at his former employment and wages. This receipt was, under §434, prima

facie evidence of the termination of the employer's liability. Claimant testified that, although his fingers had not entirely healed, he returned to his duties as an elevator operator at the suggestion of a representative of the insurance carrier and upon receiving assurance from him that he would be taken care of if he could not do the work. Continuing, he said: "[My] condition gradually got worse ...... I didn't really know what was the matter at the time. I didn't give it a thought." After working until January 13, 1927, claimant quit under circumstances thus described in his testimony. "Q. Did your fingers become sore—did you quit because of them? A. Had to leave on account of my feet. Q. What happened? A. My legs knocked me out. Q. Just describe how it affected you. A. They swelled and got red streaked and had no use of them. Q. Did you injure your feet? A. No, sir."

On February 22 he went to Jefferson Hospital for treatment, returned home for a short time, then went to Geisinger Memorial Hospital at Danville where his left leg was amputated on March 29th. In January, 1928, he returned to that hospital for the amputation of his right leg.

It is significant that although claimant was obliged to quit work on January 13, 1927, by reason of the loss of the use of his legs, the record discloses no suggestion until April 18, 1928, that there was any possible connection between the accident of March 17, 1926, and the conditions which necessitated the amputations. On that date he filed a petition with the board for a review of the agreement under which he had received compensation up to December 16, 1926; on June 21, 1928, he asked, and was granted, permission to withdraw the petition, without prejudice to his right to renew his application.

Under date of September 11, 1928, another petition "to review the said agreement as provided in §413"

was filed and became the basis of the present controversy. It is another example of those inaptly drawn petitions to which we have been obliged to refer repeatedly. It mentions specifically §413 and claimant asks that his "compensation agreement be reviewed to provide for compensation as [his] disability has reoccurred"; he further avers that "medical testimony will prove" he is still disabled as the result of his injury on March 17, 1926, and therefore prays that "the final receipt be set aside and compensation restored." The ground alleged is that "the said agreement was based upon the hereinafter stated mistake," but there is no further reference in the petition to any "mistake" of any kind in connection with the making of the agreement, nor is there the slightest justification in the testimony for any suggestion that the agreement was based upon any mistake of law or of fact. This entire proceeding is, in essence, an application under the second paragraph of §413 for the reinstatement of the agreement upon the ground that claimant's disability has recurred and increased, or, in other words, upon the ground of changes in his physical condition which occurred after the termination of the agreement. By the express terms of the amendment of 1927, the board had then no jurisdiction to entertain such a petition because it was not filed within one year from December 16, 1926,—the date of the last payment under the agreement—regardless of the fact that the accident occurred prior to the date of the amendment: Johnson v. Jeddo Highland Coal Company, 99 Pa. Superior Ct. 94; DeJoseph v. Standard Steel Car Company, ibid, 497. Here, as in the case last cited, claimant had eight months after the approval of the amendment within which to file his petition.

A prayer to set aside a final receipt is not really necessary in a petition for relief under the second paragraph of §413; that section applies only to agree-

ments or awards and contains no reference to final receipts; they are covered by §434. If relief is granted under the second paragraph of §413 the final receipt automatically disappears from the case.

We have no means of knowing whether the confusion with respect to these matters, which has appeared in several cases, is due to inappropriate blank forms prepared by the board or to efforts upon the part of claimants to evade the limitation, applicable alone to the second paragraph of §413, by inserting in their petitions for review general averments of mistake, fraud or coercion, not followed by specific allegations which, if proven, would bring their petitions under the first paragraph of §413: (See Keifer v. Phila. &. R. C. & I. Co., 102 Pa. Superior Ct. 235). Whatever the reason or motive, petitions should not be so filed; each petition should state clearly and specifically the ground upon which relief is sought. Moreover, the first paragraph of §413 applies only to existing agreements, and the mistakes contemplated therein must have occurred at the time the agreements were executed; Zupicick v. Phila. & Reading C. & I. Co., 108 Pa. Superior Ct. 165.

We agree with the conclusion of the court below to the effect that, if the petition be strictly construed, the compensation authorities were without jurisdiction to make any award to this claimant.

However, as we review, in appeals of this class, the findings of an administrative tribunal less formal than a court, and as petitions for review should be disposed of as simply and directly as is consistent with justice to both parties, we have repeatedly said that if a petition contains averments which would entitle a claimant, upon proof thereof, to relief under §434, it should be considered as filed under that section. It is not expressly averred in this petition that the final receipt was founded upon a mistake, but we gather from claim-

ant's testimony, and the statements of his counsel, that his contention is that he signed the final receipt and returned to work under a mistaken belief that his disability had ceased and that he was able to resume his employment.

By giving him the benefit of every possible doubt, as did the court below, and treating the petition as one to set aside a final receipt under §434, we come to the second question in the case, viz., whether claimant produced any competent evidence supporting the conclusion of the referee and board that the loss of his legs resulted from the exposure he experienced while serving his employer on March 17, 1926.

Three medical experts testified; only one of them, Dr. George Reese, expressed the opinion that there was a causal connection. The fundamental difficulty, however, with Dr. Reese's testimony is that his conclusion is based upon a pure assumption. He did not suggest that there was even the slightest relation or connection between the freezing of claimant's fingers and the subsequent development of the disease of his feet and legs; in fact, he stated the fingers became "practically normal," and that he advised both claimant and the insurance adjuster that claimant had fully recovered and was able to return to work. Dr. Reese also frankly admitted claimant never complained to him about his feet and he never examined them. The basis of his opinion was thus stated by him: "Q. How do you connect that condition [frost bite of the fingers] with his feet? A. Here is a man subject to cold of sufficient intensity to give him frost bite in his hand, his feet were in that same degree of cold. He may not at the time have suffered frost bite of the feet so it would be called to his notice, but may have had a little nip, which would be the beginning." The significance of the use by Dr. Reese of the word "beginning" was that he expressed the further opinion that frost

bite of the feet could be the beginning of a contraction of the arteries and thus cause a diseased condition of the feet and legs so closely resembling Berger's disease—the diagnosis of the other experts—as to be practically indistinguishable therefrom.

The assumption that claimant's feet, although not exposed as were his hands, were also frost-bitten, was not only unsupported by any evidence but, indeed, negatived by his own statement that so far as he knew nothing had happened to his feet.

Dr. Foss, a surgeon of fifteen years' experience, amputated claimant's left leg. An abstract from his testimony reads: "Q. Will you please give us the diagnosis? A. He had Berger's disease, [named for the physician who first described it]. Q. Doctor, we paid this man compensation for an injury resulting from frozen fingers occurring on March 27, 1926. In your opinion, did the frost bite have anything to do whatsoever with the development of Berger's disease, which necessitated the amputation of his legs? A. No, I don't think anything in his fingers affected his feet. ...... Q. What is Berger's disease? A. A disease in which the vessels become occluded or blocked by thrombosis. Q. What causes it? A. Nobody knows. Many theories, not definitely proven."

Dr. Ervin, who saw claimant in the hospital, heard part of the testimony and read the remainder, testified: "Q. In your opinion, what do you think was the cause that made necessary the bilateral amputation of the legs in this case? A. Berger's disease, or thrombo angiitis obliterans. ...... Thrombo angiitis —inflammatory nature—obliterans. The term tells you it is obliterans inflammatory change goes on in that vessel."

After stating that the cause of Berger's disease is not known, and after referring to the literature on the subject, his examination continued: "Q. Is there any

difference between the change that occurs in the blood vessels in Berger's disease and frost-bite? A. Yes. There is almost no similarity. In frost-bite there is a sudden insult to a vessel at a given point. It happens abruptly. Fingers bitten today and the changes occur in the next two days. Berger's disease, on the other hand, the blood vessel changes come on over a period of years. The changes are not confined to a finger or a toe or a foot. If a foot, as a rule, is involved, the vessels are involved to the knee, so it is generalized to the end of the vessels to a limb. Q. What would you say in regard to confusion of blood vessels of frost-bite and Berger's disease? A. It wouldn't be confusing. ...... Q. Can you see any connection between the frost-bite occurring in this case as an aggravating factor in producing Berger's disease later on in the lower extremities? A. No, none whatever.''

This record contains no legally competent evidence sustaining the award of the compensation authorities; all of the competent evidence is to the effect that the disability from which claimant was suffering when he filed his petition for reinstatement of the agreement was due to causes having no connection with, or relation to, the exposure to which he was subjected on March 17, 1926. The court below was clearly justified in sustaining the exceptions to the award and entering judgment in favor of the employer and its insurance carrier.

Judgment affirmed.